**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**VERNON BYERS,**

        **Plaintiff,**

**v.**                              **ACTION NO. 4:05cv112**

**HSBC FINANCE CORPORATION,**

        **Defendant.**

## OPINION AND FINAL ORDER

This case is before the court on defendant HSBC Finance Corporation's ("HSBC") motion for summary judgment. For the reasons stated below, HSBC's motion for summary judgment is **GRANTED**.

## I. Factual and Procedural History

HSBC is a consumer lending institution offering personal and real estate loans. Compl. ¶ 5. From November 14, 2003, to September 14, 2004, plaintiff Vernon Byers ("Byers") was employed by HSBC as an Account Executive in an HSBC branch office in Newport News, Virginia. Id. ¶ 9. As an Account Executive, Byers was responsible for selling HSBC's loan products. Id. In addition to salary, Byers earned a commission based on his sales volume. Mem. Law Supp. Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp. Br.") at 1. Byers' sales performance was monitored by the office's Branch Sales Manager. Mem. Law Supp. Def.'s Mot. Summ. J. ("Def.'s Br.") Ex. 2 & Pl.'s Resp. Br. Ex. 13 (Pinero's Aff.) ¶ 2. On June 8,

2004, Natasha Pinero transferred to the Newport News office to assume the office's Branch Sales Manager position. Compl. ¶ 15; Def.'s Br. Ex. 2 & Pl.'s Resp. Br. Ex. 13 (Pinero's Aff.) at ¶ 1. Pinero was Byers' immediate supervisor from the date of her transfer to the Newport News office, June 8, 2004, until September 1, 2004, the date of Byers' transfer to the Chesapeake office.[1] Def.'s Br. Ex. 2 & Pl.'s Resp. Br. Ex. 13 (Pinero's Aff.) at ¶ 1.

Byers noticed that Pinero was attracted to him on the date that she transferred to the Newport News office. Def.'s Br. Ex. 4 (Byers' dep.) at 88. Pinero's attraction to Byers manifested in several "unwelcome and unsolicited actions" occurring from that date to approximately July 15, 2004. Compl. ¶ 16. These actions include Pinero asking Byers if he had a girlfriend, inviting Byers to places outside of work, taking a piece of food from Byers' plate, and engaging in physical contacts such as hugging Byers and giving him a neck massage. See id.; Def.'s Br. Ex. 7 (Pl.'s Answer Interrog.) at ¶ 8; Def.'s Br. Ex. 4 (Byers' dep.) at 93-95, 99-100, 102-03, 105. Taken together, Byers' perceived these actions as "sexual advances" or indications that Pinero "wanted a personal rather than professional relationship" with him. Pl.'s Resp. Br. at 3. Byers alleges that he rejected Pinero's advances by "making clear that he was not interested in having a personal relationship"

---

[1] This transfer date was extended at Byers' request, but he did not appear for work at the Chesapeake office as directed and was terminated on September 14, 2004. See infra at 4-5.

2

with her, Pl.'s Resp. Br. at 8, and, as a result, she retaliated
against him.  Compl. ¶¶ 19-20.

Pinero's first allegedly retaliatory act occurred on the
morning of July 22, 2004, when Pinero reassigned one of Byers'
customers to another Account Executive, causing Byers to loose a
loan deal.  Id. ¶ 20; Def.'s Br. Ex. 2 & Pl.'s Resp. Br. Ex. 13
(Pinero's Aff.) at ¶ 5.  On the same date, Rob McMichael, HSBC
Division Human Resources Manager, Chris Crumpacker, HSBC District
Manager, and Byers spoke by phone, at which time Byers complained
to McMichael and Crumpacker that Pinero was sexually harassing him,
and he felt that she was retaliating against him for rejecting her
advances.  Compl. ¶ 19; Def.'s Br. Ex. 4 (Byers' dep.) at 156.
Since Pinero was also having "significant problems" with Byers, see
Def.'s Br. Ex. 2 & Pl.'s Resp. Br. Ex. 13 (Pinero's Aff.) at ¶ 3,
and had reported these problems to Crumpacker, McMichael and
Crumpacker met with Byers on the afternoon of July 22, 2004, to
discuss his working relationship with Pinero.  Def.'s Br. Ex. 4
(Byers' dep.) at 153-54; Def.'s Br. Ex. 6 & Pl.'s Resp. Br. Ex. 5
(Crumpacker's Aff.) at 2, ¶ 2.  At the July 22, 2004, meeting,
Byers repeated his allegations of Pinero's sexual harassment and
retaliation and reported Pinero's advances, including her asking
him if he had a girlfriend and her taking a piece of food from his

plate.[2]  Then, sometime between July 22, 2004, and August 31, 2004,

Pinero rebuked Byers for not making enough sales calls, which is

the second alleged retaliatory act by Pinero.  Compl. ¶ 20.

Conflict between Byers and Pinero continued into the month of

August, 2004.  Def.'s Br. Ex. 4 (Byers' dep.) at 161; Def.'s Br.

Ex. 5 & Pl.'s Resp. Br. Ex. 4 (McMichael's Aff.) at 3, ¶ 10.  In

late August,  McMichael and Crumpacker decided to transfer Byers,

effective September 1, 2004, to the HSBC branch office in

Chesapeake, Virginia.  Def.'s Br. Ex. 5 & Pl.'s Resp. Br. Ex. 4

(McMichael's Aff.) at 3, ¶ 12.  The Chesapeake office was one of

the most successful HSBC offices in the country.  Id.  Account

Executives in the Chesapeake office were supervised by an

experienced Branch Sales Manager, and they earned between $800-

$1000 more per month that Account Executives in the Newport News

office.  Id.  An Account Executive in the Chesapeake office had

requested a transfer to the Newport News office, and Byers would

have retained his Account Executive position upon transfer to the

Chesapeake office.  Id.  Because Byers informed Mcmichael that he

did not have adequate transportation to commute to the Chesapeake

---

[2] According to HSBC, asking Byers if he had a girlfriend and
taking a piece of food from Byers' plate were the only advances
reported during the July 22, 2004, meeting.  Def.'s Br. Ex. 5 &
Pl.'s Resp. Br. Ex. 4 (McMichael's Aff.) at 2, ¶ 7; Def.'s Br. Ex.
6 & Pl.'s Resp. Br. Ex. 5 (Crumpacker's Aff.) at 2, ¶ 4.  Byers
disputes this contention, asserting in deposition that he reported
all advances, except for the invitation to a concert or a play,
during the July 22, 2004, meeting.  Def.'s Br. Ex. 4 (Byers' dep.)
at 158.

office, the transfer's effective date was extended from September 1, 2004, to September 8, 2004, to enable Byers to resolve his transportation issue.  Pl.'s Resp. Br. Ex. 6 (termination letter from McMichael to Byers); Def. HSBC Fin. Corp.'s Reply Mem. Supp. Rule 56 Mot. Summ. J. ("Def.'s Rebuttal Br.") Ex. A (McMichael's 2nd Aff.) ¶ 1.  On September 8, 2004, Byers was informed that the effective date could not be extended beyond September 13, 2004, and if he did not report to the Chesapeake office on that date he would be terminated for job abandonment.  Id.  On September 9, 2004, Byers filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC").  Def.'s Br. Ex. 2 (Byers' EEOC charge).  Only the "retaliation" box is marked on Byers' EEOC charge, but the narrative portion of his charge alleges that "[o]n July 22, 2004, I reported to Human Resources that I believed I was being retaliated against by my supervisor for rejecting her sexual advances" and "I was transferred in retaliation for protesting what I perceived as discriminatory actions of my supervisor."  Id. Byers failed to report to the Chesapeake office on September 13, 2004, and was terminated, effective September 14, 2004, for job abandonment.  Pl.'s Resp. Br. Ex. 6 (termination letter from McMichael to Byers).  On March 31, 2005, the EEOC issued Byers a right-to-sue letter.  Pl.'s Resp. Br. Ex. 1 (Byers' right-to-sue letter).

On June 28, 2005, Byers filed a complaint in his court against

HSBC alleging hostile work environment sexual harassment, retaliation, and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et seq.</u> On December 30, 2005, HSBC filed the instant motion for summary judgment, with supporting brief and affidavits. Byers' response to HSBC's motion and responsive brief were filed on January 11, 2006, subject to defect.[3] HSBC filed its rebuttal brief on January 13, 2006, and submitted a written request for oral argument on the motion. The motion has been thoroughly briefed, and oral argument is not necessary for determination. <u>See</u> E.D. Va. Local Civ. R. 7(J) (2005) (providing that the court may rule on motions without oral argument).

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2005); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 247 (1986). The moving party bears the initial burden of identifying those portions of the pleadings, depositions, answers

---

[3] Byers' response was both late and unsigned, although he is represented by counsel.

to interrogatories, admissions, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 (1986).

When the moving party's initial burden is met, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but must proffer evidence admissible under Rule 56(e) showing that there is a genuine issue of material fact for trial. <u>See</u> Fed. R. Civ. P. 56(e) (2005) (requiring that affidavits be made on personal knowledge and set forth facts that would be admissible in evidence). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>See</u> <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted); <u>see also</u> <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987) (stating that "[u]nsupported speculation is not sufficient to defeat a summary judgment motion"). Morever, "a complete failure of proof concerning an essential element of the nonmoving party's case, necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Id.</u>

### III. Analysis

### A.   Hostile Work Environment Sexual Harassment

### 1.   Exhaustion of Administrative Remedies

In its motion for summary judgment, HSBC contends that Byers' hostile work environment sexual harassment claim is barred because he failed to exhaust his administrative remedies with respect to this claim.   In support of its contention, HSBC emphasizes that Byers marked only the "retaliation" box, and did not mark the "sex" box, on his September 9, 2004, EEOC charge, and the narrative portion of his charge does not mention either "hostile" behavior or "harassment."   Byers' responds that he did exhaust his administrative remedies with respect to his hostile work environment sexual harassment claim because the narrative portion of his EEOC charge alleges retaliation "by my supervisor for rejecting her sexual advances" and "for protesting what I perceived as discriminatory actions of my supervisor."   Def.'s Br. Ex. 2 (Byers' EEOC charge).

Before filing a civil suit under Title VII, an employee must exhaust his administrative remedies by filing a charge with the EEOC.  <u>Chacko v. Patuxent Inst.</u>, 429 F.3d 505, 508 (4th Cir. 2005). After the charge has been filed, the EEOC investigates the allegations in the charge, notifies the employer of the allegations, and, if the EEOC believes the allegations are true, it initiates agency-monitored settlement.   <u>Id.</u> at 508-10.   Not

strictly the charge itself, but the administrative process of charge, investigation, notice, and possible conciliation "plays a substantial role in focusing the formal litigation it precedes." Id. at 509.  Claims stated in the charge, claims reasonably related to the charge, and claims developed by reasonable investigation of the charge may be maintained in a subsequent Title VII suit.  Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000); see also Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996).  Thus, courts construe the charges "liberally," Chacko, 429 F.3d at 509, and failure to state a claim with "procedural exactness," Alvarado v. Bd. Trs. Montgomery Cmty. Coll., 848 F.2d 457, 460 (4th Cir. 1988), in the charge will not bar pursuit of that claim in a subsequent Title VII suit.  For example, a claim will not be barred in a Title VII suit because an employee failed to mark the box on his EEOC charge that corresponds to that claim.  See Williams v. Mancom, Inc., 323 F. Supp. 2d 693, 695 & n.2 (E.D. Va. 2004) (Smith, J.) (holding that although employee marked only the "race" and "age" boxes, and not the "retaliation" box, on her EEOC charge, a claim of retaliation is not barred because the employee had previously complained, internally, of racial discrimination, and the narrative portion of her charge alleges that she has not been rehired because of her race and age).  The relevant inquiry is whether "the factual allegations made in formal litigation . . . correspond to those set

forth in the administrative charge." <u>Chacko</u>, 429 F.3d at 509.  If the factual allegations underlying the claim are "reasonably related" to the factual allegations in the charge, then the claim may be maintained in a Title VII suit.  <u>Id.</u>  A reasonable relationship will not exist if the allegations underlying the claim and the allegations in the charge reference different discriminatory conduct, time frames, and actors.  <u>Id.</u> at 506.  In such a situation, a reasonable investigation of the charge would not have uncovered the factual allegations underlying the claim, and, thus, the employee will not be permitted to bypass the administrative process with respect to that claim.  <u>See</u> <u>id.</u> at 512-13.

Byers' hostile work environment sexual harassment claim is reasonably related to his EEOC charge and would be developed by reasonable investigation of his charge, such that the claim may be maintained in his Title VII suit.  Sexual harassment is a form of sex discrimination prohibited by Title VII.  <u>Meritor Sav. Bank, FSB, v. Vinson</u>, 477 U.S. 57, 65-66 (1986).  The Fourth Circuit recognizes two types of prohibited sexual harassment:  "harassment that creates an offensive (hostile) work environment and harassment where sexual consideration is demanded in exchange for job benefits."  <u>Spencer v. Gen. Elec. Co.</u>, 894 F.2d 651, 658 (4th Cir. 1990), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Farrar v. Hobby</u>, 506 U.S. 103 (1992).  The first type of sexual harassment is referred to as

hostile work environment sexual harassment, while the second is referred to as <u>quid pro quo</u> sexual harassment. <u>See</u> <u>id.</u>  In his Title VII suit, Byers alleges hostile work environment sexual harassment based on Pinero's advances that occurred from June 8, 2004, to approximately July 15, 2004.

Byers' EEOC charge alleges retaliation for reporting to Human Resources on July 22, 2004, that "I believed that I was being retaliated against by my supervisor for rejecting her sexual advances" and for "protesting what I perceived as discriminatory actions of my supervisor." Def.'s Br. Ex. 2 (Byers' EEOC charge). Unwelcome sexual advances is the type of sexual misconduct that constitutes prohibited sexual harassment, whether the sexual harassment is the <u>quid pro quo</u> or hostile work environment type. <u>Meritor Sav. Bank, FSB</u>, 477 U.S. at 65.[4]  Even though Byers' charge does not include terms like "hostile environment" or "harassment,"

---

[4] Byers Title VII sexual harassment claim is not based on allegations that Pinero demanded sexual favors from him in exchange for job benefits, nor does Byers argue the elements of a <u>quid pro quo</u> sexual harassment claim. <u>See</u> <u>Spencer</u>, 894 F.2d at 658 (holding that to prevail in a claim of <u>quid pro quo</u> harassment, the employee must establish that the acceptance or rejection of the supervisor's sexual solicitations was "an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment"); <u>see also</u> <u>Poss v. Charles E. Smith Realty Co.</u>, 151 F.3d 1030, 1998 WL 386103 (4th Cir. 1998) (unpublished) (holding that employee failed to establish a claim of <u>quid pro quo</u> harassment where employee alleged retaliation by his supervisor for rejecting his sexual advances and the facts show that the supervisor invited employee to his home to watch a pornographic movie, told employee to bring a condom with him because "things might get intimate," and then stated that he would tell a superior when employee replied "I don't do that").

the allegations in Byers' charge that he "reject[ed]" his supervisor's "sexual advances" indicates that the advances were unwelcome, thus raising an inference of sexual harassment.  <u>See</u> <u>Meritor Sav. Bank, FSB</u>, 477 U.S. at 68 (holding that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'"); <u>see also</u> <u>Alvarado</u>, 848 F.2d at 460 (holding that a claim may be maintained in a Title VII suit even though the claim was not alleged with procedural exactness in the charge); <u>cf.</u> <u>Taylor v. Virginia Union Univ.</u>, 193 F.3d 219, 239 (4th Cir. 1999) (en banc) (holding that employee's allegations that her supervisor called her at home and touched her on the arm several times while talking to her were too vague to raise "even the inference that these actions were done in a manner that had the intent or effect of sexually harassing [her]") <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 97-101 (2003).  Thus, both Byers' Title VII sexual harassment claim[5] and his EEOC charge reference the same discriminatory conduct, sex discrimination in the form of sexual harassment; occurring during the same time frame, while Pinero was Byers' supervisor and before the July 22, 2004, complaint to Human Resources; and involving the same actors, Byers and Pinero.  <u>Cf.</u> <u>Chacko</u>, 429 F.3d at 511-12 (holding that trial evidence consisting of two decades of co-

---

[5] For ease of reference, Byers' hostile environment sexual harassment claim will hereinafter be referred to as his "sexual harassment" claim.  <u>See</u> <u>supra</u> note 4 and accompanying text.

workers' national-origin insults and slurs is not reasonably related to the three specific confrontations with supervisors, not involving national-origin slurs, alleged in the EEOC charge).

The connection between Byers' sexual harassment claim and his charge is stronger when one looks beyond the face of Byers' charge to consider the evidence that would be uncovered in an investigation of his charge. HSBC does not challenge that Byers' allegations of retaliation in his charge are sufficient to maintain a retaliation claim in his Title VII suit. To prevail on his retaliation claim, Byers must show that he engaged in a protected activity. See infra at 24-25. Byers' charge alleges that he engaged in a protected activity on July 22, 2004, when he reported to Human Resources his supervisor's retaliation against him for rejecting her "sexual advances." See Def.'s Br. Ex. 2 (Byers' EEOC charge). It is undisputed that Byers' July 22, 2004, internal complaint consisted of allegations of Pinero's retaliation and advances. See Def.'s Br. Ex. 5 & Pl.'s Resp. Br. Ex. 4 (McMichael's Aff.) at 2, ¶ 7; Def.'s Br. Ex. 6 & Pl.'s Resp. Br. Ex. 5 (Crumpacker's Aff.) at 2, ¶ 4; Def.'s Br. Ex. 4 (Byers' dep.) at 158. Since it is uncontested that Byers' charge sufficiently alleges retaliation, it is reasonable to expect that an investigation of his allegations of retaliation would include an investigation of the protected activity alleged, Byers' July 22, 2004, internal complaint, and would uncover the alleged evidence of

Pinero's retaliation and advances in that internal complaint.  This conclusion is buttressed by the fact that HSBC's response to Byers' EEOC charge included an investigation into Byers' "sexual discrimination" claim, which uncovered evidence of Pinero's alleged advances in Byers' July 22, 2004, internal complaint.  See Pl.'s Resp. Br. Ex. 3 (HSBC's letter to EEOC).  Moreover, according to Byers, the advances alleged in the July 22, 2004, internal complaint are the same advances that form the basis of Byers' sexual harassment claim.  Def.'s Br. Ex. 4 (Byers' dep.) at 158.  Thus, it is reasonable to expect that an investigation of the allegations in Byers' EEOC charge would have uncovered the very allegations underlying Byers' sexual harassment claim.[6]  Under these circumstances, the connection between Byers' sexual harassment claim and his charge is sufficient to avoid summary judgment on the basis of failure to exhaust administrative remedies.

## 2.   Severe or Pervasive Conduct

Byers' sexual harassment claim is based on the following allegations: (1) Pinero asked Byers if he had a girlfriend, Compl.

---

[6] As previously noted, HSBC contends that only two sexual advances were alleged in Byers' July 22, 2004, internal complaint. See supra note 2.  However, drawing all inferences in favor of the non-moving party, any advances alleged in Byers' Title VII suit but not alleged in Byers' July 22, 2004, internal complaint, involve similar conduct, that occurred during the same time frame and involved the same actors as the conduct that was alleged in the July 22, 2004, internal complaint.

¶ 16; Def.'s Br. Ex. 7 (Pl.'s Answer Interrog.) ¶ 8; (2) Pinero asked Byers if he was "faithful" to his girlfriend, Pl.'s Resp. Br. at 3; (3) Pinero invited Byers to attend either a gospel concert or a play, Def.'s Br. Ex. 4 (Byers' dep.) at 94-95, 99; (4) Pinero invited Byers to visit her family's home in Aruba, id. at 93; (5) Pinero took a piece of food from Byers' plate, Compl. ¶ 16; Def.'s Br. Ex. 7 (Pl.'s Answer Interrog.) ¶ 8; Def.'s Br. Ex. 4 (Byers' dep.) at 103; (6) Pinero leaned over Byers' desk while looking at loan documents, at which time her breasts touched Byers' head, Def.'s Br. Ex. 4 (Byers' dep.) at 102; (7) Pinero hugged Byers after he closed a loan deal and/or reached a sales goal, at which time Byers could feel her breasts against his chest, id. at 105; (8) Pinero massaged Byers' neck once, id. at 99; (9) Pinero wore low-cut tops at the office, which tops accentuated her breasts, id. at 106-07; and (10) Pinero gave Byers preferential treatment, Compl. ¶ 16; Def.'s Br. Ex. 7 (Pl.'s Answer Interrog.) ¶ 8; Def.'s Br. Ex. 4 (Byers' dep.) at 100.  In its motion for summary judgment, HSBC contends that the allegations, even if true, are insufficient to satisfy an essential element of Byers' sexual harassment claim:  the requirement that the conduct be sufficiently severe or pervasive to create a hostile work environment.  HSBC argues that the allegations are insufficient because the conduct did not occur with frequency; did not include sexual proposition, sexual discussion, insults or teasing; and Byers did not allege

15

that the conduct intimidated him or affected his work performance. See Def.'s Br. at 10-17.  Byers responds by asserting that ridicule, insult, and intimidation can be sufficiently severe or pervasive, even when sexual advances or propositions are absent. See Pl.'s Resp. Br. at 9.  Byers, however, fails to identify which portions of the pleadings or evidence allege or show ridicule, insult, or intimidation, nor does Byers proffer additional evidence showing that such conduct occurred.

Title VII prohibits an employer from discriminating against an employee with respect to the terms, conditions, or privileges of employment, because of the employee's sex.  42 U.S.C. § 2000e-2(a)(1) (2003).  Since an employee's work environment is a term, condition, or privilege of employment, a cause of action may exist under Title VII if sexual harassment creates a hostile work environment.  See, e.g., Meritor Sav. Bank, FSB, 477 U.S. at 64-66; Smith, 202 F.2d at 241.  To defeat summary judgment on his sexual harassment claim, Byers bears the burden of showing that the conduct alleged was sufficiently severe or pervasive to alter the conditions of his employment and create a hostile or abusive work environment.  See Meritor Sav. Bank, FSB, 477 U.S. at 64-66; Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996).[7]  In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993),

---

[7] As noted supra at 10-11 and note 4, Byers alleges sexual harassment that creates a hostile work environment.  To prevail on this type of sexual harassment claim, an employee must prove that

the Supreme Court determined that the conduct must be judged by both an objective and a subjective standard:  the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively perceive the environment to be abusive.  See Harris, 510 at 21-22; see also Faragher v. Boca Raton, 524 U.S. 775, 787 (1998).  To determine if the conduct alleged satisfies this standard, Harris directs courts to consider all the circumstances including: (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct reasonably interfered with the employee's work performance; and (5) what psychological harm, if any, resulted.  See Harris, 510 U.S. at 23; see also Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 192-93 (4th Cir. 2000).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).  The severe or pervasive requirement "ensure[s] that courts and juries

---

(1) the conduct was unwelcome; (2) it was based on the employee's sex; (3) it was sufficiently severe or pervasive to alter the employee's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.  See Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003); Spicer v. Virginia Dep't Corr., 66 F.3d 705, 709-10 (4th Cir. 1995) (en banc).  Only element (3) is at issue in this motion.

do not mistake ordinary socializing in the workplace--such a male-on-male horseplay or intersexual flirtation--for discriminatory 'conditions of employment.'" Oncale, 523 U.S. at 81.

Considering all the circumstances in light of the Harris factors, the conduct alleged is not severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive.[8]  Although the alleged acts of sexual harassment occurred over approximately six weeks, an act did not occur daily, nor did the same act occur repeatedly.  See e.g., Def.'s Br. Ex. 4 (Byers' dep.) at 99 (stating that the alleged invitations to places outside of work were made during "two particular conversations" and "she massaged my neck once, one time"); see also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) (holding that the "very nature" of hostile environment claims "involves repeated conduct").  In the context of Byers' collegial work environment, personal questions and invitations to places outside of work would be merely sociable and commonplace.  See Def.'s Br. Ex. 4 (Byers' dep.) at 96 (testifying that in his "type of work environment, you get to know people on a personal level . . . [w]e were all on a friendly basis . . . you talk about things not related to work . .

_____

[8] As an aside, while the alleged conduct occurred in the Newport News office where numerous other employees were working, and Byers testifies that his co-workers observed Pinero's attraction to him, Def.'s Br. Ex. 4 (Byers' dep.) at 100-01, Byers offers no affidavits or other evidence from any co-workers to corroborate his allegations of a hostile or abusive work environment.

. [s]o its not uncommon to get to know somebody on a personal basis
. . . .").  Asking a co-worker if he's faithful to his girlfriend
may be imprudent or impolite, but "comparable to the kind of rude
behavior, teasing, and offhand comments that [the Fourth Circuit]
has held are not sufficiently severe and pervasive to constitute
actionable sexual harassment."  Singleton v. Dep't Corr. Educ., 115
Fed. Appx. 119, 122 (4th Cir. 2004) (unpublished); see also infra
at 21-22.  Invitations to Aruba may be uncommon, but Byers states
in his deposition that Pinero "informed [Byers] that her mother
would be thrilled to have [him]" at her family's home in Aruba, and
she never suggested that Byers have sex with her there.  Def.'s Br.
Ex. 4 (Byers' dep.) at 93-94.  While some of the alleged physical
contacts may indicate greater informality and familiarity between
a supervisor and her employee than would be expected after a few
weeks of working together, the contacts amount to mostly innocuous
social interactions, and none was overtly sexual.[9]  Byers states in
his deposition that Pinero never propositioned him for sex, invited
him to a hotel room with her, or insinuated that they should have

---

[9]For example, when Pinero's breasts allegedly touched the back
of Byers' head, Pinero was leaning over Byers' chair looking at
loan documents.  Def.'s Br. Ex. 4 (Byers' dep.) at 102.  While
Byers felt that this conduct "was a come-on or a sign of, you know,
attraction or to get my response," id., Byers did not ask Pinero to
stop.  Byers testified in his deposition that "I told her, Can I
get a little room here?  And once, again, you know, she laughed it
off and said, Oh, boy, please, or what have you.  I mean, I was
friendly with her.  I mean, I don't want to paint the picture like
I was stonewalling.  I mean, you know, I joked with her or what
have you."  Id. at 104.

sex.  Id. at 93.  Byers does not allege that Pinero ever discussed sexual subjects with Byers, showed Byers obscene materials, made sexual or obscene comments or jokes, or even commented on Byers' appearance.  See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997) (holding that conduct was not severe or pervasive where employee was not inappropriately touched or propositioned, and "[n]one of the alleged comments were even vulgar, much less obscene"); see also Singleton, 115 Fed. Appx. at 122 (holding that conduct was not severe or pervasive where employee does not allege that her supervisor "ever requested a sexual act, touched her inappropriately, discussed sexual subjects, showed her obscene materials, told her vulgar jokes, or threatened her").  The conduct alleged was not of a forceful, physically threatening, or humiliating nature, nor does Byers allege that he felt intimidated, threatened, or humiliated by Pinero's conduct.

In fact, the undisputed evidence, from Byers himself, shows that Byers did not perceive the work environment as hostile; and, rather than detract from his job performance, the alleged conduct appears to have enhanced it.  Byers states that Pinero gave him his own office so that he could better concentrate on his work.  Def.'s Br. Ex. 4 (Byers' dep.) at 112.  Byers "took advantage of the preferential treatment" that he received, stating "[m]y goal was to get a good relationship going with her, you know, and that was my strategy from a business sense, you know, to get better leads or

20

get my deals sent up first." Id. at 113. According to Byers, during the time that the alleged acts occurred, he was "Michael Jordan of the office," the "star player," and "the best salesman." Id. at 110. A boost to Byers' ego appears to be the only psychological effect of the alleged conduct. Byers states in his deposition that "it didn't bother me that [Pinero] felt I was physically attractive. I viewed it as flattering." Id. at 89-90. In addition, Byers states that a male co-worker complimented Byers on Pinero's attraction to him, suggesting that her attraction was a sign of Byers' good looks, id. at 100, and a female co-worker, who Byers also believed was attracted to him, commented, with "a hint of jealousy," on Pinero's attraction to him, id. at 101.

Finally, the conduct alleged in this case is less severe and pervasive than numerous other cases where summary judgment has been granted against employees who complain of hostile work environment sexual harassment. See, e.g., Singleton, 115 Fed. Appx. 119 (incidents where supervisor frequently commented on employee's attractiveness, stated that she should be "spanked" everyday, and made references to his physical fitness, considering his advanced age were not sufficiently severe or pervasive); Pesso v. Montgomery Gen. Hosp., 181 F.3d 90 (4th Cir. 1999) (unpublished) (incidents where supervisor frequently commented on employee's attractiveness, rubbed his upper arm, stated that she wondered what he would taste like, and suggested that the two should get a hotel room together

were not sufficiently severe or pervasive); <u>Hopkins</u>, 77 F.3d 745 (incidences where supervisor bumped into employee, positioned a magnifying glass over his crotch, flipped his tie over to see its label, gave him a congratulatory kiss at the receiving line of his wedding, and stared at him in the bathroom were not sufficiently severe or pervasive); <u>Hartsell</u>, 123 F.3d 766 (incidences where supervisor made comments about employee's appearance and made comments demeaning to women were not sufficiently severe or pervasive).

While Byers may have "felt that Ms. Pinero's attempt to fraternize with him was inappropriate," Pl.'s Resp. Br. at 6, ¶ 14, the Supreme Court has made clear that Title VII does not create a cause of action for "interpersonal flirtation," <u>see</u> <u>Oncale</u>, 523 U.S. at 81, much less for fraternizing. Since Byers has failed to allege conduct sufficiently severe or pervasive to satisfy this essential element of his hostile work environment claim, HSBC's motion for summary judgment on this claim must be **GRANTED**.

## B.  Retaliation

Byers' retaliation claim is based on the following alleged actions: (1) reassignment of one of Byers' loan deals, Compl. ¶ 20; (2) rebuke for low call volume, <u>id.</u>; (3) transfer to the Chesapeake office, <u>id.</u> at 22-23; and (4) termination, Pl.'s Resp. Br. at 11. In its motion for summary judgment, HSBC contends that for each retaliatory action alleged, Byers fails to satisfy an essential

22

element of a retaliation claim.  Specifically, HSBC argues that the rebuke for low call volumes and the transfer to the Chesapeake office were not adverse employment actions, and no causal connection existed between a protected activity and either the reassignment of the loan deal or the termination.  Alternatively, in the event that the court finds that Byers establishes a prima facie retaliation case, HSBC offers a legitimate, non-retaliatory reason for each of the alleged retaliatory actions.  Byers responds only by reasserting that retaliation was the real reason for each action:  Pinero reassigned one his loan deals and rebuked him for low call volume in retaliation for Byers' rejection of her sexual advances; he was transferred to the Chesapeake office in retaliation for reporting Pinero's advances on July 22, 2004; and he was terminated in retaliation for filing his EEOC charge on September 9, 2004.  Byers produces no evidence that HSBC's proffered reasons for the actions are false or that retaliation was the real reason for each action.

Title VII prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an unlawful employment practice.  42 U.S.C. § 2000e-3(a) (2003).  To defeat summary judgment on his retaliation claims, Byers must satisfy the three-step proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir.

1998) (holding that the <u>McDonnell Douglas</u> proof scheme applies to retaliation claims as well as to discrimination claims under Title VII).[10]  The employee bears the initial burden of establishing a prima facie case of retaliation.  <u>Id.</u>  If the employee establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action.  <u>Id.</u>  If the employer carries its burden, the employee must demonstrate that the reason that the employer proffered was merely pretext for retaliation.  <u>Id.</u>  To demonstrate that the employer's reason was pretext for retaliation, the employee must show "'<u>both</u> that the reason was false <u>and</u> that discrimination was the real reason' for the challenged conduct."  <u>Jiminez v. Mary Washington Coll.</u>, 57 F.3d 369, 377-78 (4th Cir. 1995) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)).

To establish a prima facie case of retaliation, the employee must prove:  (1) the employee engaged in a protected activity; (2) the employer took an adverse employment action against the

---

[10]  When the <u>McDonnell Douglas</u> proof scheme applies, summary judgment in favor of the employer is appropriate if the employee's proffered evidence fails to establish a prima facie case, or, if it does, the employer produces evidence that provides a legitimate, nondiscriminary reason about which the employee does not create a factual dispute.  <u>See</u> <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 319 (4th Cir. 2005) (affirming grant of summary judgment on employee's discriminatory failure-to-promote claim, because even assuming employee established a prima facie case of race discrimination, she failed to rebut her employer's asserted legitimate, non-discriminatory reason for not promoting her).

employee; and (3) a causal connection existed between the protected activity and the adverse action.  Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001).  To satisfy the first element, the employee must show that he participated in an investigation or proceeding under Title VII, by filing a charge with the EEOC, for example, or that he opposed discriminatory practices in the workplace, such as by "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998).  The second element is satisfied by showing that a retaliatory act had an adverse effect on the terms, conditions, or benefits of employment.  Von Gunten, 243 F.3d at 866.  In other words, the retaliatory act must result in "'a decrease in compensation, job title, level of responsibility, or opportunity for promotion.'"  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004) (quoting Von Gunten, 243 F.3d at 256-57).  Accordingly, negative performance evaluations, changes in working conditions, and reassignments generally do not constitute adverse employment actions.  Id. at 378 (citing Van Gunten, 243 F.3d at 869 (holding that "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment practices or . . . disciplinary procedures") and Boone v. Goldin, 178 F.3d 253, 256-

57 (4th Cir. 1999) (holding that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position")).  Even if a protected activity and adverse employment action are shown, the employee must satisfy the causation element to establish a prima facie retaliation case.  The employee must show that the adverse employment action took place after the protected activity, Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 651 (4th Cir. 2002), and because of the protected activity, Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998).  The adverse employment action will not take place "because of" the protected activity unless the relevant decisionmaker was aware that the employee had engaged in the protected activity.  Dowe, 145 F.3d at 657.

## 1.   Rebuke for Low Call Volume

Byers' retaliation claim based on the rebuke for low call volume fails the second element, because the rebuke was not an adverse employment action.  Byers has not alleged that the rebuke decreased his job title, compensation, or other benefit.  See Thompson, 312 F.3d at 651 (holding that a disciplinary discussion was not an adverse employment action because the employee maintained the same position and lost no pay).  Even had Byers

established a prima facie retaliation case based on the rebuke, he has produced no evidence showing that HSBC's proffered reason why Pinero rebuked Byers for low call volume is pretext for retaliation.  According to HSBC, Pinero, as Branch Sales Manager, was responsible for monitoring Account Executives' sales call volume, and was required to discuss Byers' low call volume with him.  Def.'s Br. Ex. 2 & Pl.'s Resp. Ex. 13 (Pinero's Aff.) at ¶ 2. Rather than refute the truth of HSBC's proffered reason, Byers concedes, in his deposition, that a Branch Sales Manager needs to monitor Account Executives' sales call volume, and he admits that he sometimes made no sales calls in a day.  Def.'s Br. Ex. 4 (Byers' Aff.) at 55.  Byers has produced no evidence showing that HSBC's reason for the rebuke was false, nor that the real reason for Pinero's rebuke was retaliation.

## 2.   <u>Transfer to Chesapeake Office</u>

Byers' retaliation claim based on his transfer to the Chesapeake office similarly fails because the transfer is not an adverse employment action.  It is undisputed that Byers would have maintained the same Account Executive position in the Chesapeake office, and Account Executives in the Chesapeake office earned more per month than Account Executives in the Newport News office.  <u>See</u> Def.'s Br. Ex. 5 & Pl.'s Resp. Ex. 4 (McMichael's Aff.) at 3, ¶ 12. Byers has not alleged or shown that the transfer would have afforded him less opportunity for career advancement.  <u>See</u> <u>Johnson</u>

27

v. Quin Rivers Agency for Cmty. Action, Inc., 140 F. Supp. 2d 657, 664 (E.D. Va. 2001) (holding that transfer to another office was not an adverse employment action because even though some of the employee's duties would be different, she received no reduction in salary or benefits and actually received a salary increase), aff'd 33 Fed. Appx. 88 (4th Cir. 2002) (unpublished).  While the transfer to the Chesapeake office may have required a longer commute, "modest stress" caused by a longer commute does not render the transfer an adverse employment action, when his position, salary level, and opportunities for promotion remain the same.  See Boone, 178 F.3d at 256-57 (holding that while reassignment to a position that required employee to work in a wind tunnel created "modest stress" not present in employee's previous laboratory position, the reassignment did not constitute an adverse employment action).

Even had Byers established a prima facie case of retaliation based on the transfer, he has produced no evidence showing that HSBC's proffered reason for the transfer is pretext for retaliation.  It is undisputed that Byers had been a top performer, see Def.'s Br. Ex. 6 & Pl.'s Resp. Ex. 5 (Crumpacker's Aff.) at 3, ¶ 11, but Pinero was having problems with Byers, see Def.'s Br. Ex. 2 & Pl.'s Resp. Br. Ex. 13 (Pinero's Aff.) at ¶ 3, and Byers would have preferred to have had a seasoned manager, Def.'s Ex. 4 (Byers' dep.) at 50-51.  It is further undisputed that the Chesapeake office, with its experienced Branch Sales Manager, was one of the

top performing offices.  See Def.'s Br. Ex. 5 & Pl.'s Resp. Ex. 4 (McMichael's Aff.) at 3, ¶ 12.  It is undisputed that an Account Executive in the Chesapeake office had requested transfer to the Newport News office, id., and when Byers started working at HSBC, he expressed a willingness to transfer to a different office within the metropolitan area, Def.'s Br. Ex. 4 (Byers' dep.) at 31.  According to HSBC, the transfer appeared to be the "perfect solution" for these issues.  Def.'s Br. Ex. 6 & Pl.'s Br. Ex. 5 (Crumpacker's Aff.) at 3, ¶ 7.  Byers has produced no evidence showing that the real reason for his transfer was retaliation.

### 3.   Reassignment of Loan Deal

HSBC places the causation element at issue in Byers' retaliation claim based on reassignment of the loan deal.  To determine if the causation element is satisfied, the relevant protected activity must first be identified.  Byers alleges that Pinero reassigned the loan deal in retaliation for Byers' rejecting her advances.  See Compl. ¶¶ 19-20; Pl.'s Resp. Br. at 11.  Byers' "rejection" of Pinero's advances consisted of declining her social invitations and making clear that he was not interested in having a personal relationship with her.  Pl.'s Resp. Br. at 8.  Byers does not allege, nor does the evidence show, that he ever told Pinero he suspected her advances violated Title VII, that her advances were harassing him, or even that he found her advances inappropriate.  Byers did not voice opposition to or complain of

29

Pinero's advances to Pinero or anyone else at HSBC, until his July 22, 2004, internal complaint. Compl. ¶ 18. Thus, to establish a prima facie case of retaliation based on reassignment of the loan deal, Byers must show a causal connection existed between Byers' July 22, 2004, internal complaint and the reassignment. Both the internal complaint and the reassignment occurred on July 22, 2004, but which event occurred first is unknown. See Compl. ¶ 19 (alleging that he complained of Pinero's retaliation and sexual harassment during the phone call with McMichael and Crumpacker that occurred on July 22, 2004); Def.'s Br. Ex. 2 & Pl.'s Resp. Ex. 13 (Pinero's Aff.) at ¶ 5 (averring that the reassignment occurred on the morning of July 22, 2004); Def.'s Br. Ex. 6 & Pl.'s Resp. Ex. 5 (Crumpacker's Aff.) at ¶ 2 (averring that Byers complained of Pinero's retaliation and sexual harassment during the meeting held on the afternoon of July 22, 2004); Def.'s Br. Ex. 4 (Byers' dep.) at 156 (testifying that the phone call with McMichael and Crumpacker occurred before the meeting held on July 22, 2004). Regardless of whether the reassignment occurred before or after the internal complaint, the evidence shows that Pinero, the relevant decisionmaker, did not know that Byers ever complained of sexual harassment until after Byers left employment with HSBC. See Def.'s Br. Ex. 2 & Pl.'s Resp. Br. Ex. 13 (Pinero's Aff.) at ¶ 5; Def.'s Br. Ex. 5 & Pl.'s Resp. Br. Ex. 4 (McMichael's Aff.) at 2, ¶ 9. Since the relevant decisionmaker was unaware of Byers' internal

complaint, the loan deal was not reassigned "because of" Byers's internal complaint, and there was no causal connection between the internal complaint and the reassignment.  See Dowe, 145 F.3d at 657.

Even had Byers established a prima facie retaliation case based on reassignment of the loan deal, he has produced no evidence that HSBC's proffered reason for the reassignment is pretext for retaliation.  According to HSBC, Pinero reassigned one of Byers' customers to another Account Executive, causing Byers to lose the loan deal, because that particular customer complained about Byers' attitude.  Def.'s Br. Ex. 2 & Pl.'s Resp. Ex. 13 (Pinero's Aff.) at ¶ 5.  Rather than refute the truth of HSBC's proffered reason, Byers concedes, in his deposition, that there was an issue with this particular customer.  Def.'s Br. Ex. 4 (Byers' dep.) at 59. Byers has produced no evidence showing that the real reason for the reassignment was retaliation.

**4.  Termination**

Finally, Byers fails to show a causal connection between his September 9, 2004, filing of his EEOC charge and his September 14, 2004, termination.  Byers was transferred to the Chesapeake office effective September 1, 2004, but the effective date was extended, at Byers' request, so he could arrange transportation.[11]  Byers was informed on September 8, 2004, that he would be terminated, if he

---

[11] See supra note 1 and accompanying text and supra at 4-5.

did not report to the Chesapeake branch by September 13, 2004. Pl.'s Resp. Ex. 6 (termination letter from McMichael to Byers); Def.'s Rebuttal Br. Ex. A (McMichael's 2nd Aff.) at ¶ 2.  Thus, the decision to terminate Byers, conditioned on his failure to report to the Chesapeake office on September 13, 2004, was made before, not after, Byers' filed his EEOC charge.  See Thompson, 312 F.3d at 651.  Moreover, the evidence offered shows that Byers was not terminated "because of" his EEOC charge, because McMichael, the relevant decisionmaker, did not know that Byers filed his EEOC charge until October, 2004, weeks after Byers' September 14, 2004, termination.  Def.'s Rebuttal Ex. A. (McMichael's 2nd Aff.) at ¶ 3. Even had Byers established a prima facie case of retaliation based on his termination, he has produced no evidence that HSBC's proffered reason for his termination is pretext for retaliation. Byers does not dispute the fact that he effectively abandoned his job on September 13, 2004, by failing to report to the Chesapeake office.  Byers has produced no evidence showing that the real reason for his termination was retaliation, and not job abandonment.

In summary, Byers fails to establish a prima facie claim of retaliation based on any of the alleged retaliatory actions.  Even if he had, he produces no evidence showing that HSBC's proffered reasons for the actions are pretext for retaliation.  Accordingly, HSBC's motion for summary judgment on Byers' retaliation claim must

be **GRANTED**.

## C.   **Constructive Discharge**

Byers alleges that Pinero's retaliation made his working conditions unbearable and his transfer to the Chesapeake office was designed to induce him to leave employment with HSBC such that he was constructively discharged.  Compl. ¶ 25; Pl.'s Resp. Br. at 3, 12.  In its motion for summary judgment, HSBC contends that Byers has failed to show both essential elements of a constructive discharge claim: that his working conditions were intolerable and that HSBC deliberately made them intolerable.  HSBC argues that Byers has not shown intolerability because he admitted in his deposition that the conditions at the Newport News office were not intolerable and he did not know whether the conditions in the Chesapeake office would be intolerable.  See Def.'s Br. at 29 (citing Def.'s Br. Ex. 4 (Byers' dep.) at 183).  Byers responds with only allegations that HSBC's actions were deliberately designed to induce him to leave, and offers no argument or evidence that his working conditions were intolerable.

"A constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."  Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (internal quotations marks and citation omitted).  To defeat summary judgment on his constructive discharge claim, Byers must show that his working conditions were

33

intolerable.   See id.   Intolerability is judged by an objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign.   Id.   Intolerable conditions are "unreasonably harsh conditions, in excess of those faced by [the employee's] co-workers."   Id.   "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."   Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994).

Byers' constructive discharge claim fails because he has not shown that his working conditions were intolerable.   Since Byers has not shown that Pinero's alleged sexual harassment from June 8, 2004, to approximately July 15, 2004, created a hostile or abusive working environment, see supra at 14-22, he cannot show that those same actions created intolerable working conditions.   See Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995) (explaining that "intolerable" working conditions necessary for a constructive discharge claim are more severe than conditions that give rise to a hostile work environment claim); English v. Pohanka of Chantilly, Inc., 190 F. Supp. 2d 833, 839 (E.D. Va. 2002) (holding that since summary judgment is granted on employee's hostile work environment sexual harassment claim, employee "a fortiori cannot show that his working conditions were of such an intolerable nature that they constituted constructive

discharge under Title VII"). Byers admitted in his deposition
that the conditions in the Newport News office were not
intolerable, after July 15, 2004, the date that Pinero's alleged
sexual harassment ended. Def.'s Br. Ex. 4 (Byers' dep.) at 183.
Even though the transfer to the Chesapeake office would require a
longer commute, Byers has not shown that the transfer constitutes
an adverse employment action, see supra at 27-29, and has offered
no evidence that the longer commute would be "unreasonably harsh"
in comparison to the commute required of his co-workers, see
Bristow, 770 F.2d at 1255. Therefore, Byers has not shown that
the transfer created an intolerable working condition. Moreover,
Byers admitted in deposition that he did not know whether the
conditions in the Chesapeake office itself would be intolerable.
Def.'s Br. Ex. 4 (Byers' dep.) at 183. Since Byers fails to show
intolerability, HSBC's motion for summary judgment on Byers'
constructive discharge claim must be **GRANTED**.

### IV. Conclusion

For the reasons set forth above, defendant's motion for
summary judgment is **GRANTED** on all claims. The Clerk is **DIRECTED**
to enter judgment for defendant in accordance with this Opinion
and Final Order, and to send a copy of this Opinion and Final
Order to counsel for plaintiff and defendant.

**IT IS SO ORDERED.**

_____/s/_____
**Rebecca Beach Smith**

**Norfolk, Virginia**

**February 17, 2006**